IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAINTER TOOL, INC., *a Pennsylvania Corporation*, | ) ) | |
| | ) | Civil Action No. 17-206 |
| Plaintiff, | ) | Chief Magistrate Judge Maureen P. Kelly |
| | ) | |
| v. | ) | |
| | ) | |
| DUNKIRK SPECIALTY STEEL, LLC, *a Delaware Limited Liability Company,* and EARLE M. JORGENSEN COMPANY, *a Delaware Corporation*, | ) ) ) ) | Re: ECF Nos. 19 and 22 |
| | ) | |
| Defendants. | ) | |

## OPINION

**Kelly, Chief Magistrate Judge**

Plaintiff Painter Tool, Inc. ("Plaintiff") filed this civil lawsuit seeking to recover damages it alleges to have sustained from its use of steel manufactured by Defendant Dunkirk Specialty Steel, LLC ("Dunkirk") and supplied by Defendant Earle M. Jorgensen Company ("EMJ"). Before the Court are two Motions to Dismiss: one filed by Dunkirk, ECF No. 19, and one filed by EMJ, ECF No. 22. For the reasons that follow, Dunkirk's Motion to Dismiss will be granted in part and denied in part and EMJ's Motion to Dismiss will be granted in part and denied in part.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff originally filed its Complaint in the Court of Common Pleas of Westmoreland County. The case was removed to this Court on February 13, 2017. ECF No. 1. Dunkirk filed a Motion to Dismiss on February 18, 2017. ECF No. 4. This Court subsequently granted Plaintiff's Motion for Leave to File an Amended Complaint and denied Dunkirk's Motion to

Dismiss as moot.  ECF Nos. 13-14.  On April 4, 2017, Plaintiff filed the operative Complaint.[1]

ECF No. 17.

In the Complaint, Plaintiff makes the following allegations.  On August 8, 2013, Plaintiff

was awarded a contract from the United States Navy for the construction of 400 steel valves

("the Navy contract").  Id. ¶ 6.  Plaintiff was to be paid $2,414,000 under the Navy contract.  Id.

¶ 7.  The Navy contract specified that the stems for the valves had to be made to certain

specifications, notably "SAE-AMS-QQ-S-763, Class 410, Condition T."  Id. ¶ 8.  Plaintiff sent a

purchase order to EMJ for "507 feet (min.) x .750" Dia. RD, (43 Bars 12' R/L), 410 SS, Heat

Treated to Condition 'T' per QQ-S-763B. 776 lbs" for a total price of $2,366.80 ("the Purchase

Order").  Id. ¶ 9.  EMJ accepted the Purchase Order and, on September 18, 2013, EMJ shipped

steel ("the Materials") to Plaintiff, along with a Dunkirk's Material Certification ("the First

Material Certification") of the Materials.  Id. ¶¶ 11-12.  The First Material Certification met the

specifications of both the Purchase Order and the Navy contract and in reliance thereupon,

Plaintiff paid EMJ in full and began manufacturing the valves.  Id. ¶¶ 14-15.

In or about February and March of 2014, Plaintiff completed hardness testing of the

finished valve stems and assembled the first 50 valves.  Id. ¶ 17.  On March 13, 2014, Plaintiff

submitted its certifications for those 50 valves for review and approval by the Navy.  Id.

Plaintiff then completed the remaining valves for the Navy contract.  Id.

After receipt of the certifications for the first 50 valves, the Navy raised concerns

pertaining to the steel from which the valve stems were made.  Id. ¶ 18.  The Navy requested that

Plaintiff provide it with a revised material certification from Dunkirk.  Id.  Dunkirk issued "the

---

[1]  This Complaint is entitled "Second Amended Complaint."  ECF No. 17.  Plaintiff filed an original Complaint and
an Amended Complaint in the Court of Common Pleas.  ECF No. 1-2.

Second Material Certification" on March 26, 2014, which was substantially identical to the First Material Certification. Id. ¶ 19.

On April 29, 2014, Dunkirk issued "the Third Material Certification" and "the Fourth Material Certification." Id. ¶ 20. These certifications represented that the Materials had a hardness level of 287 BHN/30 HRC, *i.e.*, that the steel was harder than originally represented. Id. ¶ 21. In response to the change in representation of the hardness level of the Materials, the Navy requested that Plaintiff provide it with a complete history of the heat treatment performed on the Materials by Dunkirk. Id. ¶ 22. On November 10, 2014, Dunkirk issued "the Fifth Material Certification" in which Dunkirk represented that the Materials had been heat treated to Condition H rather that to Condition T as requested in the Purchase Order. Id. ¶ 24.

The Navy conducted an audit of Plaintiff and its facility in December of 2014. On December 19, 2014, in response to the audit, Plaintiff sent two samples of the finished stems, manufactured with the Materials, to Westmoreland Mechanical Testing & Research, Inc. ("WMT&R") for an independent hardness examination. Id. ¶ 26. WMT&R issued its report that same day, finding unacceptable hardness levels for the specifications of the Purchase Order. Id. ¶ 27.

On January 6, 2015, the Navy issued a report as to its audit, finding that Dunkirk failed to provide steel that met the specifications of the Navy contract and the Purchase Order because the Materials had been heat treated to achieve Class 410, Condition H, not Class 410, Condition T. Id. ¶ 29. The report further concluded that the failure to meet these specifications had a direct impact on the ultimate product. Id.

Due to the improper hardness level of the steel, the Navy rejected the stems/valves produced by Plaintiff on multiple occasions. Id. ¶ 31. Plaintiff incurred significant additional

expenses in correcting the hardness level of the steel.  Id. ¶ 32.  In replacing the valves so that the Navy would accept them, Plaintiff incurred costs of over $275,000.  Id. ¶ 33.

Further, as a result of the audit and the defective steel, Plaintiff's business reputation and goodwill were damaged and it lost numerous Navy contracts that it would have received.  Id. ¶ 34.  In total, Plaintiff has suffered at least $1,200,000 in damages for lost profits, loss of business operations, loss of reputation and goodwill, loss of future contracts and other incidental and consequential damages.  Id. ¶ 35.

In its Complaint, Plaintiff alleges ten counts: (1) Count I against EMJ for breach of contract; (2) Count II against EMJ for breach of express warranty; (3) Count III against EMJ for breach of implied warranty of merchantability; (4) Count IV against EMJ for breach of implied warranty of fitness for a particular purpose; (5) Count V against EMJ for unjust enrichment; (6) Count VI against Dunkirk for promissory estoppel; (7) Count VII against Dunkirk for breach of express warranty; (8) Count VIII against Dunkirk for breach of implied warranty of merchantability; (9) Count IX against Dunkirk for breach of implied warranty of fitness for a particular purpose; and (10) Count X against Dunkirk for negligent misrepresentation.  Id. at 7-15.

On April 18, 2017, Dunkirk filed its instant Motion to Dismiss and Brief in Support.  ECF Nos. 19-20.  On May 15, 2017, Plaintiff filed its Brief in Opposition to Dunkirk's Motion to Dismiss.  ECF No. 25.  On May 25, 2017, Dunkirk filed a Reply Brief.  ECF No 30.

On April 25, 2017, EMJ filed its instant Motion to Dismiss and Brief in Support.  ECF Nos. 22-23.  On May 15, 2017, Plaintiff filed its Brief in Opposition to EMJ's Motion to Dismiss.  ECF No. 26.  On May 31, 2017, EMJ filed a Reply Brief.  ECF No. 31.

The Motions to Dismiss are now ripe for consideration.

## II. STANDARD OF REVIEW

As the United States Supreme Court explained in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), a complaint may properly be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." Id. at 570. In assessing the merits of a claim subject to a motion to dismiss, a court must accept all alleged facts as true and draw all inferences gleaned therefrom in the light most favorable to the non-moving party. Phillips v. County of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008) (citing Worldcom, Inc. v. Graphnet, Inc., 343 F.3d 651, 653 (3d Cir. 2003)). A pleading party need not establish the elements of a *prima facie* case at this stage; the party must only "put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].'" Fowler v. UPMC Shadyside, 578 F.3d 203, 213 (3d Cir. 2009) (quoting Graff v. Subbiah Cardiology Associates, Ltd., 2008 WL 2312671 (W.D. Pa. June 4, 2008)).

In its review, the Court may consider exhibits attached to the complaint, matters of public record and undisputedly authentic documents upon which the plaintiff's claims are based. Kriley v. IBM Corp., Civ. A. No. 16-1860, 2017 U.S. Dist. LEXIS 70978, at *5 (W.D. Pa. May 10, 2017)(citations omitted).

## III. DISCUSSION

### A. Motion to Dismiss filed by EMJ

#### 1. Count I: Breach of contract

In Count I, Plaintiff alleges that EMJ breached its obligations under the terms of the Purchase Order by failing to ship conforming goods without any material defects. ECF No. 17 ¶ 40. Although Plaintiff's allegations under Count I do not identify the nature of the non-conformance or the specific material defect, in the preceding "Facts" section of the Complaint,

and in its Brief in Opposition to EMJ's Motion to Dismiss, Plaintiff makes clear that the basis of Count I is that EMJ shipped steel bars that that been heat-treated to condition "H" and not condition "T." ECF No. 17 at 1-7; ECF No. 26 at 9.

EMJ asserts that it did not breach the Purchase Order in this manner because steel that is heat-treated to Condition "H" also meets the requirements of Condition "T." ECF No. 23 at 8. At this stage of the case, the Court will not engage in fact-finding as to the meanings of steel specifications. Plaintiff's allegations of a material difference between the specification of the steel ordered and the Materials delivered are sufficient to establish a plausible claim for breach of contract.

Accordingly, EMJ's Motion to Dismiss Count I will be denied.

### 2. Count II: Breach of express warranty

As it did in seeking to dismiss Count I, EMJ seeks to dismiss Count II on the basis that the steel EMJ sold to Plaintiff met or exceeded all of the express requirements of the Purchase Order. ECF No. 23 at 9-10. As the Court found in denying EMJ's Motion to Dismiss Count I, the Court finds that the determination as to whether the express requirements were met or exceeded by a different heat-treated condition is a question of fact not appropriate for resolution at this stage.

Accordingly, EMJ's Motion to Dismiss Count II will be denied.

### 3. Count III: Breach of implied warranty of merchantability

In Count III, Plaintiff alleges that EMJ breached its implied warranty of merchantability in that the Materials "did not pass without objection in the trade under the description in the Purchase Order." ECF No. 17 ¶ 51.

As the United States Court of Appeals for the Third Circuit recently explained:

Under Pennsylvania law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 13 PA. CONS. STAT. ANN. § 2314(a). The Pennsylvania Supreme Court has explained that

> [t]he concept of "merchantability" does not require that the goods be the best quality, or the best obtainable, but it does require that they have an inherent soundness which makes them suitable for the purpose for which they are designed, that they be free from significant defects, that they perform in the way that goods of that kind should perform, and that they be of reasonable quality within expected variations and for the ordinary purpose for which they are used.

> Gall by Gall v. Allegheny Cty. Health Dep't, 521 Pa. 68, 555 A.2d 786, 789-90 (Pa. 1989) (citations omitted). Thus, to establish a breach of this warranty, a plaintiff must show, among other things, that the product at issue was defective. Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d 1102, 1105 (3d Cir. 1992). A plaintiff can meet this burden by proving that the product "functioned improperly in the absence of abnormal use and reasonable secondary causes." Id. (citation and internal quotation marks omitted).

Am. Atelier, Inc. v. Materials, Inc., No. 16-2107, 2017 U.S. App. LEXIS 851, at *3 (3d Cir. Jan. 18, 2017).

EMJ argues that: (1) Plaintiff fails to allege that the Materials were not below commercial standards or generally unacceptable in the trade; and (2) EMJ expressly disclaimed the warranty of merchantability in its order confirmation. ECF No. 23 at 10-11.

In opposition to EMJ's Motion to Dismiss, Plaintiff asserts that the Materials were not merchantable because they had been heat-treated to a condition other than that specified in the Purchase Order. ECF No. 26 at 13-15.

Because Plaintiff only alleges that the Materials failed to meet its specifications and fails to allege a defect in the steel which prevented it from being used for its ordinary purpose, Plaintiff fails to advance a plausible claim as to a breach of implied warranty of merchantability. Accordingly, EMJ's Motion to Dismiss Count III will be granted.

**4.    Count IV:    Breach of implied warranty of fitness for a particular purpose**

In Count IV, Plaintiff alleges, *inter alia*, that EMJ was aware that Plaintiff would use the Materials for a particular purpose in a shipboard system for the Navy and that Plaintiff relied on EMJ's skill and judgment in purchasing the Materials. ECF No. 17 ¶¶ 54, 57.

As the United States Court of Appeals for the Third Circuit has explained:

> The warranty of fitness for a particular purpose is more exacting [than the warranty of merchantability]. It requires that the seller had reason to know of the buyer's particular purpose at the time of contracting and that the buyer was relying on the seller's expertise. In that case, the goods are implicitly warranted to be fit for that particular purpose. 13 PA. CONS. STAT. § 2315. To establish a breach of either warranty, plaintiffs must show that the equipment they purchased from defendant was defective.

Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d 1102, 1105 (3d. Cir. 1992).

EMJ acknowledges that the Purchase Order referenced a number designation for Plaintiff's contract with the Navy, but EMJ argues that the allegations as to its knowledge of Plaintiff's purpose in purchasing the Materials are mere conclusory statements which should not be credited. ECF No. 23 at 12. In its Response to EMJ's Motion to Dismiss, Plaintiff confirms that it is relying on its reference in the Purchase Order to the Navy Contract to "impute[] constructive knowledge upon EMJ that [Plaintiff] was purchasing steel for a particular purpose." ECF No. 28 at 15. The Purchase Order is attached to operative Complaint. ECF No. 17-1. The sole reference therein to the Navy contract is in a box identifying Plaintiff's Contract as: N00104-13-C-FA78. Id. at 1; ECF No. 17 ¶ 6. This document, therefore, does not support Plaintiff's allegation that EMJ had knowledge of the particular purpose for the Materials, *i.e.*, for use in a shipboard system for the Navy. Where allegations are contradicted by written

documents attached to the complaint, the documents trump the allegations.  Campbell v. M&T

Bank, 2017 U.S. Dist. LEXIS 41041, at *2 (W.D. Pa. March 22, 2017)(citation omitted).

Plaintiff thus fails to advance a plausible claim as to a breach of implied warranty of

fitness for a particular purpose.  Accordingly, EMJ's Motion to Dismiss Count IV will be

granted.

### 5.    Count V:    Unjust enrichment

In Plaintiff's Response to EMJ Motion to Dismiss, it concedes to the dismissal of Count

V.  ECF No. 26 at 16.  Accordingly, EMJ's Motion to Dismiss Count V will be granted.

### B.    Motion to Dismiss filed by Dunkirk

### 1.    Count VI:    Promissory estoppel

In Count VI, Plaintiff alleges that it relied on Dunkirk's promise as to the specifications

of the Materials.  ECF No. 17 at 11-12.

In support of its Motion to Dismiss, Dunkirk first argues that Plaintiff cannot maintain a

claim for promissory estoppel against Dunkirk where Dunkirk made no promise that could form

the basis of such a claim.  ECF No. 20 at 15.

Pennsylvania has adopted § 90 of the Restatement (Second) of Contracts which states:

> A promise which the promisor should reasonably expect to induce action or
> forbearance on the part of the promisee or a third person and which does
> induce such action or forbearance is binding if injustice can be avoided only
> by enforcement of the promise.

Thatcher's Drug Store of W. Goshen, Inc. v. Consol. Supermarkets, 636 A.2d 156, 160 (Pa.

1994) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981)).

In response to this argument, Plaintiff identifies the express promise made by Dunkirk as

the representation in the First Material Certification that the Materials were heat-treated to

condition "T."  ECF No. 25 at 8.  Although Dunkirk baldly asserts that "it is not possible to

contort Dunkirk's Material Certifications into an express promise," ECF No. 20 at 15, the Court finds that the representations made in the First Material Certification establish a plausible basis for a promissory estoppel claim.

Dunkirk also argues that Plaintiff fails to allege reasonable reliability on the First Material Certification. Id. at 15-17. In support of this argument, Dunkirk cites to allegations about tensile strength set forth in Plaintiff's earlier complaints, the unspecified "contradictory" nature of the First Material Certification, Plaintiff's own hardness testing and Plaintiff's failure to request from Dunkirk the heat treatment information required by the Navy contract. Id. at 16-17. At this stage of the case, Plaintiff's allegations of its reliance on the First Material Certification issued by Dunkirk, the manufacturer of the subject steel, are sufficient.

Finally, Dunkirk appears to challenge the "injustice" prong of the promissory estoppel claim, contrasting the cost of the steel and the corrective action taken with the amount of damages sought. Id. at 17. This contrast does not pose a basis upon which to grant a Motion to Dismiss.

Accordingly, Dunkirk's Motion to Dismiss is denied as to Count VI.

### 2. Count VII: Breach of express warranty

In Count VII, Plaintiff alleges that Dunkirk breached an express warranty by providing Plaintiff with steel that "did not conform to the description or specifications required under the Purchase Order[2] or that Dunkirk certified under the various Material Certifications.[3]" ECF No. 17 ¶ 78.

---

[2] In Paragraph 75 of the Complaint, Plaintiff states, "Dunkirk was aware of the detailed specifications of the steel that was required under the Purchase Order, and Dunkirk was aware that it was required to provide material certifications to [Plaintiff] for that steel under the Purchase Order." ECF No. 17 ¶ 75. It appears that Plaintiff has mistakenly named Dunkirk instead of EMJ in this paragraph. EMJ was the sole alleged recipient of the Purchase Order. Id. ¶ 74.
[3] Although the Complaint allegations concern "Material Certifications," ECF No. 17 ¶¶ 76, 78, in its Memorandum of Law in Opposition to Dunkirk's Motion to Dismiss, Plaintiff clarifies that this claim concerns only the First

In support of its Motion to Dismiss as to Count VII, Dunkirk argues that it only made an express warranty to EMJ, not to Plaintiff. ECF No. 20 at 18-19.

In Pennsylvania, a third party may enforce an express warranty "only under circumstances where an objective fact-finder could reasonably conclude that: (1) the party issuing the warranty intends to extend the specific terms of the warranty to the third party (either directly or through an intermediary); and (2) the third party is aware of the specific terms of the warranty, and the identity of the party issuing the warranty." Fairmont Supply Co. v. Cressman Tubular Prods. Corp., Civ. A. No. 10-1606, 2011 U.S. Dist. LEXIS 24506, at *18 (quoting Goodman v. PPG Industries, Inc., 849 A.2d 1239, 1246 (Pa. Super. Ct. 2004)).

In its operative Complaint, Plaintiff alleges that "[b]y providing the various Material Certifications, Dunkirk made an affirmation of fact or promise that the steel it manufactured that was ultimately provided to [Plaintiff] under the Purchase Order would conform to that affirmation or promise." ECF No 17 ¶ 76. Plaintiff fails to allege, however, that Dunkirk intended the specific terms of any express warranty to extend to Plaintiff. Instead, in opposition to Dunkirk's Motion to Dismiss, Plaintiff argues that because Dunkirk gave a warranty to EMJ which EMJ provided to Plaintiff, it can be inferred that Dunkirk gave a warranty to Plaintiff. ECF No. 25 at 12-13. Plaintiff provides no authority for such an inference and none is evident to the Court.

Accordingly, Dunkirk's Motion to Dismiss as to Count VII will be granted.

---

Material Certification. ECF No. 25 at 11 ("In the present case, the facts alleged in the [Complaint] demonstrate that Dunkirk's promise in the First Material Certification created an express warranty that the Materials were heat-treated to condition "T.")

### 3. Count VIII: Breach of implied warranty of merchantability

In the Complaint, Plaintiff alleges that Dunkirk breached an implied warranty of merchantability "in that the Materials did not pass without objection in the trade under the description in the Purchase Order and for which Dunkirk had warranted." ECF No. 17 ¶ 83.

In support of its Motion to Dismiss as to Count VIII, Dunkirk argues that Plaintiff does not allege that the steel that Dunkirk provided was unfit for commercial use as stainless steel alloy. ECF No. 20 at 22-24.

As set forth *infra*:

> Under Pennsylvania law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 13 PA. CONS. STAT. ANN. § 2314(a). The Pennsylvania Supreme Court has explained that
>
> > [t]he concept of "merchantability" does not require that the goods be the best quality, or the best obtainable, but it does require that they have an inherent soundness which makes them suitable for the purpose for which they are designed, that they be free from significant defects, that they perform in the way that goods of that kind should perform, and that they be of reasonable quality within expected variations and for the ordinary purpose for which they are used.
>
> Gall by Gall v. Allegheny Cty. Health Dep't, 521 Pa. 68, 555 A.2d 786, 789-90 (Pa. 1989) (citations omitted). Thus, to establish a breach of this warranty, a plaintiff must show, among other things, that the product at issue was defective. Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d 1102, 1105 (3d Cir. 1992). A plaintiff can meet this burden by proving that the product "functioned improperly in the absence of abnormal use and reasonable secondary causes." Id. (citation and internal quotation marks omitted).

Am. Atelier, Inc., 2017 U.S. App. LEXIS 851, at *3.

As to the Purchase Order, Dunkirk was not a party thereto. Thus, the Purchase Order is not a basis on which Plaintiff can advance a plausible claim against Dunkirk. As to Dunkirk's express warranty, a variation as to a certain specification thereof does not necessarily denote to a

defect in the Materials. Because Plaintiff has failed to allege a defect in the steel which prevented it from being used for its ordinary purpose, Plaintiff failed to advance a plausible claim as to a breach of implied warranty of merchantability. Accordingly, Dunkirk's Motion to Dismiss Count VIII will be granted.

### 4. Count IX: Breach of implied warranty of fitness for a particular purpose

In the Complaint, Plaintiff alleges the following facts in support of Count IX:

> 86. Dunkirk was aware that [Plaintiff] would use the Materials for a particular purpose in a crucial shipboard system for the United States Navy.
> 87. Dunkirk was aware of the special and particular purpose for which [Plaintiff] purchased the Materials.
> 88. Dunkirk was aware that [Plaintiff] was relying on its skill and judgment such that the Materials would meet [Plaintiff's] special and particular purpose.
> 89. [Plaintiff] relied on Dunkirk's skill and judgment in purchasing the Materials.

ECF No. 17 ¶¶ 86-89.

In support of its Motion to Dismiss, Dunkirk argues that this claim fails because "it would be impossible for Dunkirk to have known of [Plaintiff's] purposes at the time it sold and shipped the steel to EMJ, which is the only relevant time with respect to [Plaintiff's] implied warranty of fitness claim against Dunkirk." ECF No. 20 at 21.

As set forth *infra*:

> The warranty of fitness for a particular purpose is more exacting [than the warranty of merchantability]. It requires that the seller had reason to know of the buyer's particular purpose at the time of contracting and that the buyer was relying on the seller's expertise. In that case, the goods are implicitly warranted to be fit for that particular purpose. 13 PA. CONS. STAT. § 2315. To establish a breach of either warranty, plaintiffs must show that the equipment they purchased from defendant was defective.

Altronics, 957 F.2d at 1105.

Plaintiff's allegations as to Dunkirk's knowledge of Plaintiff's purpose are contradicted by allegations in the "FACTS" section of the Complaint where Plaintiff makes clear that it contacted EMJ, not Dunkirk, to purchase the Materials. Id. ¶¶ 9-11. Apparently recognizing this problem with its factual basis for this claim, Plaintiff argues in opposition to Dunkirk's Motion to Dismiss that "whether Dunkirk specifically knew [Plaintiff's] purpose in ultimately purchasing the steel from EMJ is irrelevant to its claim against Dunkirk for breach of the implied warranty of fitness for a particular purpose." ECF No. 25 at 16. However, as set forth in the legal standard above, Dunkirk's knowledge is, in fact, a critical element to a claim for breach of implied warranty of fitness for a particular purpose.

In support of its argument, Plaintiff cites to Spagnol Enterprises, Inc. v. Digital Equipment Corp., 568 A.2d 948 (Pa. Super. Ct. 1989), for the proposition that "the implied warranty of fitness for a particular purpose extends to any plaintiff 'where the injury has been incurred as a result of a defectively manufactured product which in turn results in a needless expenditure of monies in attempting to make the defective product operational and functional so as to be productive in a "business-sense."'" ECF No. 25 at 15-16 (citing Spagnol, 568 A.2d at 952). However, the quoted sentence from Spagnol is followed by this sentence: "To hold otherwise, would be to permit a manufacturer to place a product in the stream of the market and plead no liability when the instrument does not conform to the buyer's needs *which were known by the manufacturer at the time the item was sold*." Spagnol, 568 A.2d at 952 (emphasis added).

Because Plaintiff's allegations in support of this claim fail to establish that Dunkirk knew of Plaintiff's purpose for the Materials at the time of their sale and thus fail to establish a plausible claim for breach of implied warranty for fitness for a particular purpose, Dunkirk's Motion to Dismiss as to Count IX is granted.

**5.    Count X:    Negligent misrepresentation**

In Count X, Plaintiff alleges that it justifiably relied on Dunkirk's misrepresentation as to

the material specifications of the Materials.  ECF No. 17 at 14-15.

In support of its Motion to Dismiss, Dunkirk argues that this claim is barred by the

economic loss doctrine.  ECF No. 20 at 19-20.  As explained by the United States Court of

Appeals for the Third Circuit:

> Pennsylvania's economic loss doctrine "'provides that no cause of action
> exists for negligence that results solely in economic damages
> unaccompanied by physical or property damage.'" Sovereign Bank [v. BJ's
> Wholesale Club, Inc.], 533 F.3d [162] at 175 [(3d Cir. 2008)] (quoting
> Adams v. Copper Beach Townhome Cmtys., L.P., 2003 PA Super 30, 816
> A.2d 301, 305 (Pa. Super. 2003)). The doctrine "'is concerned with two
> main factors: foreseeability and limitation of liability.'" Id. (quoting Adams,
> 816 A.2d at 307). The first Pennsylvania appellate court to discuss the
> doctrine explained,
>
>> "To allow a cause of action for negligent cause of purely economic
>> loss would be to open the door to every person in the economic chain
>> of the negligent person or business to bring a cause of action. Such an
>> outstanding burden is clearly inappropriate and a danger to our
>> economic system."
>
> Aikens v. Baltimore & Ohio R.R. Co., 348 Pa. Super. 17, 501 A.2d 277,
> 279 (Pa. Super. 1985). The Pennsylvania Supreme Court has recognized the
> doctrine's existence. See Excavation Techs., Inc. v. Columbia Gas Co. of
> Pa., 985 A.2d 840, 841-43 (Pa. 2009).

Azur v. Chase Bank, USA, 601 F.3d 212, 222-23 (3d Cir. 2010).

In opposition to Dunkirk's Motion to Dismiss, Plaintiff asserts that the economic loss

doctrine is inapplicable to this case on the basis of the exception to the doctrine set forth by the

Pennsylvania Supreme Court in Bilt-Rite Contractors, Inc. v. The Architectural Studio, 866 A.2d

270 (Pa. 2005).

In Bilt-Rite, the Pennsylvania Supreme Court carved out a narrow exception to the

economic loss doctrine, rendering the doctrine inapplicable "in cases where information is

negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information." Id. at 287. In so doing, the Pennsylvania Supreme Court clarified the contours of negligent misrepresentation "as it applies to those in the business of providing information to others." Id.

Plaintiff asserts that the Bilt-Rite exception is applicable to its claim for negligent misrepresentation because Dunkirk "supplied false information in the course of its business regarding the specifications of the steel…." ECF No. 25 at 18. The Court disagrees.

Plaintiff alleges in the Complaint that Dunkirk is a specialty finished and semi-finished steel manufacturer. ECF No. 17 ¶ 2. There is no allegation that Dunkirk is in a business of providing information, nor does it appear that it is. Thus, the narrow exception set forth in Bilt-Rite does not apply and Plaintiff's claim of negligent misrepresentation is barred by the economic loss doctrine.

Accordingly, Dunkirk's Motion to Dismiss Count X will be granted.

## IV.   CONCLUSION

For the foregoing reasons, EMJ's Motion to Dismiss, ECF No. 22, will be denied as to Count I and Count II and granted as to Count III, Count IV and Count V.

Additionally, Dunkirk's Motion to Dismiss, ECF No. 19, will be denied as to Count VI and granted as to Count VII, Count VIII, Count IX and Count X. An appropriate Order follows.

**ORDER**

AND NOW, this 13th day of July, 2017, IT IS HEREBY ORDERED that the Motion to Dismiss filed by EMJ, ECF No. 22, is DENIED as to Count I and Count II and GRANTED as to Count III, Count IV and Count V.

IT IS FURTHER ORDERED that the Motion to Dismiss filed by Dunkirk, ECF No. 19, is DENIED as to Count VI and GRANTED as to Count VII, Count VIII, Count IX and Count X.

By the Court:

/s/ Maureen P. Kelly
Chief United States Magistrate Judge

cc:    All counsel of record via CM/ECF